# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IBIO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 10256-VCF |
| | ) | |
| FRAUNHOFER USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION

Date Submitted:  June 11, 2020
Date Decided:  September 25, 2020

David E. Ross and Eric D. Selden, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Reed S. Oslan, Mark W. Premo-Hopkins, Britt Cramer, and Lee M. Mason, KIRKLAND & ELLIS LLP, Chicago, Illinois; *Attorneys for Plaintiff iBio, Inc.*

Todd C. Schiltz, DRINKER BIDDLE & REATH LLP, Wilmington, Delaware; Paul H. Saint-Antoine, D. Alicia Hickok, Richard E. Coe, and Mark D. Taticchi, DRINKER BIDDLE & REATH LLP, Philadelphia, Pennsylvania; *Attorneys for Fraunhofer USA, Inc.*

**FIORAVANTI, Vice Chancellor**

This case involves a dispute between two biotechnology companies over their contractual relationship. Plaintiff iBio, Inc. ("Plaintiff" or "iBio") and Defendant Fraunhofer USA, Inc. ("Defendant" or "Fraunhofer") enjoyed a commercial relationship for several years pursuant to which Fraunhofer developed plant-based biopharmaceutical technology for iBio.

In 2014, iBio discovered that Fraunhofer had entered into an agreement to develop plant-based biopharmaceuticals for an iBio competitor. iBio alleges that Fraunhofer's agreement with the competitor violates iBio's own agreement with Fraunhofer, that Fraunhofer misappropriated iBio's technology in the performance of its duties for the competitor, and that Fraunhofer failed to comprehensively transfer to iBio ownership of the technology that Fraunhofer had developed.

The parties have been engaged in litigation since 2014. In 2016, the Court issued an opinion that resolved in iBio's favor "the scope of the technology in Fraunhofer's possession . . . to which iBio has ownership rights and to which iBio is entitled to receive a transfer from Fraunhofer."[1] Fraunhofer has now moved for summary judgment as to all of iBio's claims. As explained below, the motion for summary judgment is granted in part and denied in part. iBio's declaratory

---

[1] *iBio, Inc. v. Fraunhofer USA, Inc.*, 2016 WL 4059257 (Del. Ch. July 29, 2016) (the "2016 Opinion").

judgment, breach of contract, misappropriation of trade secrets, tortious interference, and deceptive trade practices claims survive for trial.

## I.     FACTUAL BACKGROUND

This Opinion will only address those facts necessary to adjudicate the issues presented in Fraunhofer's motion for summary judgment. The following facts are drawn from the operative pleadings[2] and the materials presented in connection with the motion.[3]

### A.     The Parties

iBio is a biotechnology company incorporated in Delaware.[4] Fraunhofer is a non-profit corporation incorporated in Rhode Island and headquartered in Michigan.[5] It is a subsidiary of Fraunhofer Gesellschaft ("Gesellschaft"), a German

---

[2] The parties' operative pleadings are the Verified Supplemental and Second Amended Complaint of iBio, Inc. (Dkt. 287) ("Sec. Am. Compl.") and Defendant Fraunhofer USA, Inc.'s Amended Answer and Second Amended Affirmative Defenses to Verified Supplemental and Second Amended Complaint and Amended Verified Counterclaims (Dkt. 342) ("Ans.").

[3] Fraunhofer submitted 244 exhibits in support of its motion. *See* Transmittal Aff. of Todd C. Schiltz in Supp. of Fraunhofer USA, Inc.'s Mot. for Summ. J. (Dkt. 473) ("Schiltz Aff."); Transmittal Aff. of Ryan T. Costa in Supp. of Fraunhofer USA, Inc.'s Reply in Supp. of its Mot. for Summ. J. (Dkts. 503, 504). iBio submitted 81 exhibits in support of its opposition. *See* Transmittal Aff. of Eric D. Selden in Connection With iBio, Inc.'s Answering Br. in Opp'n to Fraunhofer USA, Inc.'s Mot. for Summ. J. (Dkt. 491) ("Selden Aff.").

[4] Sec. Am. Compl. ¶ 18. iBio's predecessors were NuCycle Therapy, Inc., INB-Bio Technologies, Inc., Integrated BioPharma, Inc., and iBioPharma, Inc. For clarity, this opinion will refer to iBio and its predecessors collectively as "iBio." *Id.* ¶ 1 n.2.

[5] *Id.* ¶ 2; Ans. ¶ 2.

3

not-for-profit organization.[6] Fraunhofer operates nine research centers in the United States, including the Center of Molecular Biotechnology (the "Center") based in Newark, Delaware.[7] In 2005, Dr. Vidadi Yusibov assumed the role of Executive Director of the Center.[8]

### B.    iBio and Fraunhofer's Contractual Relationship

In the early 2000s, iBio sought to develop plant-based technology to make proteins for human vaccines and other biotechnologies.[9] In 2003, iBio engaged Fraunhofer for that purpose.[10] Pursuant to this arrangement, Fraunhofer developed a "proprietary vector technology" used to produce target plant proteins "at high yield."[11]

Between 2003 and 2014, iBio and Fraunhofer documented their commercial relationship through numerous agreements. Four are pertinent to this Opinion: the Technology Transfer Agreement, dated December 18, 2003 (the "TTA");[12] the Fourth Amendment of the TTA, effective August 20, 2007 (the "Fourth

---

[6] Ans. ¶ 2; Schiltz Aff. Ex. 200, at FCMB0055337; Schiltz Aff. Ex. 182, at FCMB0434389.

[7] Sec. Am. Compl. ¶ 2; Ans. ¶ 2; Schiltz Aff. Ex. 182, at FCMB0434389; Schiltz Aff. Ex. 93, at iBio0034755.

[8] Ans. ¶ 69; Schiltz Aff. Ex. 14, at 9:13–18, 178:3–8.

[9] Sec. Am. Compl. ¶ 20.

[10] Selden Aff. Ex. 4, at 8–12.

[11] Schiltz Aff. Ex. 112, at iBio0057051.

[12] Selden Aff. Ex. 10.

4

Amendment");[13] the Transfer and License Agreement, effective November 3, 2008 (the "TLA");[14] and the Terms of Settlement for the Seventh Amendment of the TTA, effective June 30, 2013 (the "Terms of Settlement").[15]

Under the TTA, Fraunhofer agreed to develop plant-based technology for iBio's exclusive license until 2008.[16] In return, iBio agreed to provide Fraunhofer $2.25 million over a period of five years and an additional $250,000 if iBio exercised, as it ultimately did in 2008, its option to purchase full title to the technology.[17] Fraunhofer retained a limited license to enable use of the technology contemplated by the TTA in certain circumstances.[18]

The parties entered into the Fourth Amendment to extend Fraunhofer's obligation to continue developing technology for iBio through the end of 2014.[19] As the Court's 2016 Opinion explained, the Fourth Amendment expanded the scope of the technology transfer to which iBio is entitled. *iBio*, 2016 WL 4059257, at *7.

In 2008, iBio exercised its option to purchase full title to the technology, and the parties executed the TLA to effectuate the title conveyance. Under the TLA,

---

[13] Selden Aff. Ex. 11.

[14] Selden Aff. Ex. 12.

[15] Selden Aff. Ex. 13.

[16] TTA § 2.1(a).

[17] *Id.* §§ 3.2, 3.3.

[18] *Id.* § 2.1(a).

[19] Fourth Amendment §§ 2, 6.

5

Fraunhofer agreed to "assign[], transfer[] and deliver[] to [iBio], . . . all right, title and interest in and to the Technology and Improvements including the Intellectual Property Rights developed in connection with the Research Agreements."[20] The Intellectual Property Rights expressly included proprietary rights under trade secret law.[21]

After the TLA was executed, iBio was not satisfied with Fraunhofer's efforts to transfer the technology.[22] iBio frequently complained about Fraunhofer's inadequate technology transfers and reporting.[23] Coincidentally, iBio was consistently late in making payments to Fraunhofer. By early June 2013, iBio owed Fraunhofer significant sums of money.[24] The parties further disagreed about the structure of iBio's payments to Fraunhofer: iBio wanted to shift from unrestricted

---

[20] TLA § 2.1; *see also id.* § 8.1 ("All right, title and interest in and to the Technology and Improvements, including the Intellectual Property Rights relating thereto, shall be and remain the sole and complete property of [iBio]. Fraunhofer recognizes and acknowledges [iBio's] exclusive ownership of the Technology and Improvements, including all Intellectual Property rights relating thereto, and will execute such additional documents as may be necessary to perfect [iBio's] ownership of such rights.").

[21] *Id.* § 1.5.

[22] *E.g.*, Schiltz Aff. Ex. 20; Schiltz Aff. Ex. 81.

[23] Schiltz Aff. Ex. 133, at FCMB001076 (iBio noting "significant problems for iBio as a public company due to the inability or unwillingness of Fraunhofer to provide information iBio needed to measure Fraunhofer performance and satisfy iBio's accounting and legal requirements"); Schiltz Aff. Ex. 197 (iBio asking for an ETA on transfer of information from Fraunhofer to Novici); Schiltz Aff. Ex. 55, at iBio0155640 (iBio memo noting that "iBio has experienced chronic difficulty in obtaining full disclosure of information to which iBio has clear rights and which it needs to meet its deadlines and public milestones").

[24] Schiltz Aff. Ex. 194; Schiltz Aff. Ex. 196; Schiltz Aff. Ex. 44.

funding to project-specific payments that would permit iBio to dictate how its funding would be utilized.[25]

In mid-2013, the parties executed the Terms of Settlement. The Terms of Settlement forgave certain of iBio's payment obligations and provided mutual releases for accrued claims arising out of the parties' prior agreements.[26]

### C. iBio Learns of Fraunhofer's Contractual Agreements with PlantForm and Others.

In 2013, Fraunhofer entered into an agreement with non-party PlantForm Corporation ("PlantForm"), a Canadian biotech company and iBio competitor.[27] In June 2014, iBio learned of Fraunhofer's relationship with PlantForm. iBio contends that Fraunhofer's agreement with PlantForm breached Fraunhofer's agreements with iBio and that Fraunhofer misappropriated iBio's technology through the work it performed for PlantForm.[28]

iBio alleges that it learned through discovery in this litigation that Fraunhofer also conducted work for Celgene Corporation and NellOne Therapeutics, Inc. using

---

[25] Schiltz Aff. Ex. 133, at FCMB001076 (iBio wanting to "direct[] the money to specific projects with agreed budgets").

[26] Terms of Settlement § 6.

[27] Schiltz Aff. Ex. 148; Schiltz Aff. Ex. 49.

[28] Sec. Am. Compl. ¶ 95.

iBio's technology.[29]  iBio asserts that Fraunhofer performed that work as early as September 2010, which continued during the pendency of this litigation.[30]

### D.    The Litigation

On October 17, 2014, iBio filed a complaint in this Court against PlantForm and its president, asserting claims for tortious interference with contract, trade secret misappropriation, and unjust enrichment.[31]

On March 17, 2015, iBio filed a separate action against Fraunhofer, the Center, and Yusibov, asserting claims for breach of numerous contracts, trade secret misappropriation, conversion, and violation of the Delaware Uniform Deceptive Trade Practices Act ("UDTPA"), 6 *Del. C*. § 2531.[32]

On April 9, 2015, the Court entered a stipulation and order consolidating the two actions.[33]  iBio filed an amended complaint on September 29, 2015.[34]

---

[29] iBio, Inc.'s Answering Br. in Opp'n to Fraunhofer USA, Inc.'s Mot. for Summ. J., at 23 (Dkt. 491) ("Pl.'s Answering Br."); Selden Aff. Ex. 19, at 266:24–280:6.

[30] Pl.'s Answering Br. 23.

[31] C.A. No. 10256-VCF, Verified Compl. (Dkt. 1).

[32] C.A. No. 10801-VCP, Verified Compl. (Dkt. 1).

[33] Stipulation and Order of Consolidation (Dkt. 51).  On August 25, 2015, the parties filed a stipulation dismissing PlantForm and its president from the case with prejudice.  Joint Stipulation of Dismissal with Prejudice of Defs. PlantForm Corporation and Don Stewart (Dkt. 65).  On September 16, 2015, the parties voluntarily dismissed Yusibov from the case without prejudice.  Notice of Voluntary Dismissal of Claims Against Def. Vidadi M. Yusibov Pursuant to Rule 41(a)(1)(i) (Dkt. 70).

[34] Verified Am. Compl. of iBio, Inc. (Dkt. 70).

As the parties engaged in discovery and related motion practice, the Court indicated that the prudent course would be to address the following threshold question: "What is the scope of the technology in Fraunhofer's possession—under all of the relevant agreements between the parties—to which iBio has ownership rights and to which iBio is entitled to receive a transfer from Fraunhofer?"[35] The parties stipulated and agreed to brief and present argument on that issue.[36]

On July 29, 2016, the Court issued the 2016 Opinion resolving this threshold question, largely in iBio's favor. It found that the scope of iBio's ownership rights to technology and rights to receive transfer of technology, under its agreements with Fraunhofer: (1) encompasses all proprietary rights of any kind to technology, developed by Fraunhofer through December 31, 2014, in the area of plant-based manufacturing technologies, techniques and methodologies and associated improvements, whether for the expression of vaccines and therapeutic proteins or otherwise, whether previously owned by Fraunhofer, developed for iBio pursuant to the TTA, or otherwise; (2) is not limited to the 49 United States patents and patent applications listed in the 2013 Confirmatory Assignment; and (3) includes know-how. *iBio*, 2016 WL 4059257, at *4.

---

[35] Rulings of the Ct. on Defs.' Mot. for Protective Order (Dkt. 138).

[36] Stipulation and Order Regarding Briefing of Threshold Question (Dkt. 137).

9

iBio filed what is now the operative complaint in this action on February 27, 2017 (the "Second Amended Complaint"). The Second Amended Complaint contains twelve counts:

- Count One seeks a declaratory judgment concerning "the scope of iBio's exclusive ownership rights to technology and rights to receive transfer of technology[] pursuant to its agreements with Fraunhofer;"[37]

- Count Two claims that Fraunhofer materially breached several provisions of the TTA and TLA and seeks a declaratory judgment that "Fraunhofer is required to facilitate and accomplish technology transfer to iBio" and that iBio is entitled "to an order of specific performance[] requiring Fraunhofer to transfer all plant-based technology developed or acquired pursuant to the TTA;"[38]

- Count Three seeks a declaratory judgment that "Fraunhofer has no right to use of iBio's technology under the TTA" except in limited circumstances and "an injunction preventing Fraunhofer from engaging in further . . . unauthorized use of iBio's technology and in further acts that are inconsistent with iBio's exclusive ownership rights;"[39]

- Count Four claims that Fraunhofer materially breached several provisions of the TTA, the TLA, and the Fourth Amendment and seeks "monetary compensation as a result of its injuries caused by Fraunhofer's material and bad faith breaches;"[40]

- Count Five claims that Fraunhofer committed fraud;[41]

- Count Six claims that Fraunhofer committed conversion;[42]

---

[37] Sec. Am. Compl. ¶ 151.

[38] *Id.* ¶ 162.

[39] *Id.* ¶¶ 168, 171.

[40] *Id.* ¶¶ 175, 177.

[41] *Id.* ¶¶ 178–85.

[42] *Id.* ¶¶ 186–91.

10

- Count Seven claims that Fraunhofer tortiously interfered with iBio's prospective economic advantage when Fraunhofer competed with iBio for a business opportunity using iBio's technology;[43]

- Count Eight claims that Fraunhofer misappropriated iBio's trade secrets, thereby violating the Delaware Uniform Trade Secrets Act ("DUTSA");[44]

- Count Nine seeks a "constructive trust over the technology that Fraunhofer has developed after 2014 based on its use of iBio's technology;"[45]

- Count Ten seeks "partial recission of the agreements between iBio and Fraunhofer to the extent Fraunhofer was given rights to use iBio's technology and to the extent iBio would owe royalties for its use of iBio's technology;"[46]

- Count Eleven claims that Fraunhofer has been unjustly enriched "through funding from iBio and other parties intended to enhance and improve iBio's technology, and through the benefits received from Fraunhofer's unauthorized uses of and misrepresentations about ownership of iBio's technology" and seeks "disgorgement of the benefits Fraunhofer has received;"[47]

- Count Twelve claims that Fraunhofer violated Section 2532(a) of UDTPA in myriad ways.[48]

---

[43] *Id.* ¶¶ 192–97.

[44] *Id.* ¶¶ 198–204.

[45] *Id.* ¶ 209.

[46] *Id.* ¶ 212.

[47] *Id.* ¶ 214.

[48] *Id.* ¶¶ 218–24. On November 3, 2017, iBio filed a separate action against Gesellschaft in this Court, alleging that Gesellschaft directed Fraunhofer to breach the agreements with iBio and that Gesellschaft conspired with Fraunhofer to breach the agreements. C.A. No. 2017-0790-TMR, Verified Compl. (Dkt. 1). On December 10, 2018, this Court dismissed the complaint against Gesellschaft, concluding that iBio's complaint was barred by laches. Mem. Op. (Dkt. 52); *iBio, Inc. v. Fraunhofer-Gesellschaft Zur Förderung Der Angewandten Forschung E.V.*, 2018 WL 6493503 (Del. Ch. Dec. 10, 2018). On January 6, 2020, iBio sought to amend the Second Amended Complaint to add Gesellschaft as a new party to this action. C.A. No. 10256-VCF, iBio, Inc.'s Mot. to Amend the Verified Suppl. and Second Am. Compl. (Dkt. 500). On June 11, 2020, the Court denied the motion to amend, with leave for iBio to refile its claim against Gesellschaft as a separate action.

On November 15, 2019, Fraunhofer filed a motion for summary judgment on all of iBio's claims.[49] The parties fully briefed the motion,[50] and the Court heard oral argument on June 11, 2020.

## II. ANALYSIS

Under Court of Chancery Rule 56, summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Ct. Ch. R. 56(c). The Court must view the facts in the light most favorable to the non-moving party. *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 100 (Del. 1992). A request for summary judgment "must be denied if there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or the inferences to be drawn therefrom." *In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 2014 WL 2768782, at *8 (Del. Ch. June 12, 2014) (quoting *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970)).

"There is no 'right' to a summary judgment." *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002). Accordingly, "the court may, in its discretion, deny

---

Oral Arg. Regarding Def.'s Mot. for Summ. J. and Pl.'s Mot. to Amend the Compl. and the Ct.'s Ruling on the Mot. to Amend (Dkt. 533) ("Oral Arg. Tr.").

[49] Fraunhofer USA, Inc.'s Mot. for Summ. J. (Dkt. 473).

[50] Fraunhofer USA, Inc.'s Br. in Supp. of its Mot. for Summ. J. (Dkt. 473) ("Def.'s Opening Br."); Pl.'s Answering Br.; Fraunhofer USA, Inc.'s Reply Br. in Supp. of its Mot. for Summ. J. ("Def.'s Reply Br.").

summary judgment if it decides upon a preliminary examination of the facts presented that it is desirable to inquire into and develop the facts more thoroughly at trial in order to clarify the law or its application." *El Paso*, 2014 WL 2768782, at *9; *accord In re Morrow Park Hldg. LLC*, 2020 WL 3415649, at *10 (Del. Ch. June 22, 2020).

Fraunhofer's summary judgment motion can be broken down into five general categories. First, Fraunhofer argues that summary judgment is appropriate on Count Eight for trade secret misappropriation because iBio has failed to establish with specificity what trade secrets Fraunhofer has allegedly misappropriated or that iBio communicated them to Fraunhofer.[51] Second, Counts Three, Five, Nine, Ten, and Eleven are duplicative of iBio's breach of contract claims or are requests for remedies improperly repackaged as free-standing "claims."[52] Third, Counts Five, Six, Seven, Eleven, and Twelve are displaced by DUTSA.[53] Fourth, the remaining four Counts—Counts One, Two, Four, and Eight—are barred by laches.[54] Fifth, Counts One, Two, Four, and Eight are barred by the Terms of Settlement and by iBio's own breach.[55]

---

[51] Def.'s Opening Br. 54–59; Def.'s Reply Br. 24–33.

[52] Def.'s Opening Br. 34–36; Def.'s Reply Br. 10–12.

[53] Def.'s Opening Br. 28–33; Def.'s Reply Br. 5–9.

[54] Def.'s Opening Br. 36–44; Def.'s Reply Br. 13–19.

[55] Def.'s Opening Br. 44–53; Def.'s Reply Br. 19–24.

13

### A. Fraunhofer Is Not Entitled to Summary Judgment on iBio's Trade Secret Misappropriation Claim Under DUTSA.

Count Eight asserts that, "[b]y using or proposing to use iBio's technology[] without iBio's authorization, Fraunhofer has improperly used and disclosed, or it intends improperly to use and disclose, iBio's trade secrets."[56] Fraunhofer argues that iBio has failed to establish the elements of its misappropriation claim under DUTSA.

The Delaware Supreme Court succinctly stated the test for a statutory trade secrets misappropriation claim as follows: "To prove trade secret misappropriation, the plaintiff must demonstrate that: (1) a trade secret exists; (2) the plaintiff communicated the secret to the defendant; (3) there was an express or implied understanding that the secrecy of the matter would be respected; and (4) the secret information was improperly used or disclosed to the injury of the plaintiff." *Elenza, Inc. v. Alcon Labs. Hldg. Corp.*, 183 A.3d 717, 721 (Del. 2018). Fraunhofer argues that iBio has failed to establish the first two elements of this test.

#### 1. iBio Has Sufficiently Identified its Trade Secrets at This Stage.

Fraunhofer first contends that iBio has not satisfied the first element of a claim for misappropriation of trade secrets because iBio has failed to identify with

---

[56] Sec. Am. Compl. ¶ 202.

specificity the relevant trade secret[57] and alternatively because iBio's claimed trade secret includes information in the public domain.[58]

Under DUTSA, a trade secret is:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique or process, that:
>
> a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

6 *Del. C.* § 2001(4). "Accordingly, to qualify as a 'trade secret' information must both derive independent economic value from not being generally known or readily ascertainable and be subject to reasonable efforts to maintain its secrecy." *Beard Res., Inc. v. Kates*, 8 A.3d 573, 589 (Del. Ch. 2010).

"A trade secret can be the combination of steps into a process . . . , even if all the component steps are known, so long as it is a 'unique process which is not known in the industry.'" *Elenza*, 183 A.3d at 721 (quoting *Merck & Co. v. SmithKline Beecham Pharms. Co.*, 1999 WL 669354, at *15 (Del. Ch. Aug. 5, 1999)). At the summary judgment stage, the plaintiff must "describe its trade secret with a

---

[57] Def.'s Opening Br. 56.

[58] *Id.* at 57.

reasonable degree of precision and specificity . . . such that a reasonable jury could find that plaintiff established each statutory element of a trade secret." *Savor, Inc. v. FMR Corp.*, 2004 WL 1965869, at *6 (Del. Super. July 15, 2004) (internal quotation marks and citation omitted).

iBio describes the misappropriated trade secret as "the optimized process for operating its plant-based manufacturing system as a whole, the optimized process of applying it to specific proteins, and the proprietary methods and know-how for optimizing each step of the process."[59] Each stage of the manufacturing process contains confidential components: vector construct design and testing, agrobacterium selection, growth, and infiltration, plant growth, extraction buffer composition, purification, characterization, and formulation.[60] iBio's expert acknowledges the relevant "techniques are generally understood within the field,"[61] but opines that, "[e]ven if individual techniques are generally known within the field, the sequence and interaction of those techniques, how they are applied, and the precise conditions that allow for optimal use of those techniques as applied to a specific protein offers valuable information."[62] Accordingly, iBio asserts that the

---

[59] Pl.'s Answering Br. 49.

[60] Selden Aff. Ex. 18 ¶¶ 55–127.

[61] *Id.* ¶ 40.

[62] *Id.* ¶ 38; *see also id.* ("[T]he process as a whole represents commercially valuable knowledge over and above knowledge of the [individual] parts."); *id.* ¶ 40 ("[T]he work of assembling these different techniques into a useful manufacturing process, along with the

16

"process as a whole is so valuable"[63] and that the process as a whole constitutes its trade secrets.[64]

When read in the light most favorable to iBio, the Court is satisfied that iBio has provided enough information to allow a reasonable fact-finder to conclude that "the optimized process for operating [iBio's] plant-based manufacturing system as a whole, the optimized process of applying it to specific proteins, and the proprietary methods and know-how for optimizing each step of the process"[65] collectively constitute trade secrets worthy of statutory protection and are not "readily ascertainable" within the terms of DUTSA. *Savor*, 2004 WL 1965869, at *6; *cf. Beard Res.*, 8 A.3d at 594–95 (finding process not "readily ascertainable" because "a competitor could not have generated a similar system without expending a comparable amount of time and money").

### 2. Further Development of the Record Is Needed Concerning the Act of Misappropriation.

Fraunhofer next argues that iBio has failed to satisfy the second element of a claim for misappropriation of trade secrets because Fraunhofer developed the

---

work of ensuring that each technique has been optimized is highly demanding and time consuming. Even for scientists trained in the field, it would require significant time and resources to reproduce Fraunhofer's work.").

[63] *Id.* ¶ 41.

[64] Pl.'s Answering Br. 49.

[65] *Id.*; *see* Selden Aff. Ex. 18 ¶¶ 13, 38–42.

technology claimed to be a trade secret and, therefore, iBio did not "communicate[]

the trade secret" to Fraunhofer. *Elenza*, 183 A.3d at 717.[66]

Under the Delaware Uniform Trade Secrets Act, "misappropriation" means:

> Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
> 1. Used improper means to acquire knowledge of the trade secret; or
>
> 2. At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade was:
>
>    A. Derived from or through a person who had utilized improper means to acquire it;
>
>    B. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>
>    C. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>
> 3. Before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

6 *Del. C.* § 2001(2)(b).

---

[66] The parties seem to agree that Fraunhofer, rather than iBio, developed the technology at issue. *See* Pl.'s Answering Br. 10 (referring to the "trade secrets developed by Fraunhofer"); Def.'s Opening Br. 4 ("[Fraunhofer] developed this technology at [the Center], based on a combination of public domain information and its own research.").

iBio maintains that Section 2001(2)(b)(2)(B) applies because "Fraunhofer developed technology on behalf of iBio . . . for over a decade" and that it did so "pursuant to a series of contractual agreements which gave Fraunhofer limited rights" and "required [Fraunhofer] to keep its work developing technology on iBio's behalf confidential."[67]

Under the TTA, "Fraunhofer grant[ed] to [iBio] an exclusive license to use and to develop products derived from or incorporating the Technology" in certain contractually specified areas,[68] including "expression, engineering, testing, production and validation of human vaccines, human antibodies and human therapeutic proteins in plants."[69] The TTA expressly "creat[ed] an independent contractor relationship" between iBio and Fraunhofer.[70]

Under the TTA, iBio had the option to "make a single payment of $250,000 to Fraunhofer" in exchange for the transfer of "full title" to the technology contemplated therein.[71] iBio made that payment on November 2, 2008, and the parties entered into the TLA to effectuate the transfer of title contemplated by the

---

[67] Pl.'s Answering Br. 56. Plaintiff also asserts that Section 2001(b)(1) applies on the ground that "Fraunhofer defrauded iBio to gain and maintain access to iBio's technology." *Id.* As discussed below, however, Plaintiff's fraud claim is unsuccessful.

[68] TTA § 2.1(a).

[69] *Id.* at 1 (Recitals).

[70] *Id.* § 9.3.

[71] *Id.* § 3.3.

TTA.[72] Under the TLA, Fraunhofer agreed to "assign[], transfer[] and deliver[] to [iBio] . . . all right, title and interest in and to" the relevant technology and "all modifications, revisions, additions, customizations, and enhancements" to that technology, including proprietary rights provided under trade secret law.[73] The TLA provides that these items "shall be and remain the sole and complete property of [iBio]," and Fraunhofer "recognize[d] [iBio's] exclusive ownership" thereof.[74] Just as the TTA "creat[ed] an independent contractor relationship" between iBio and Fraunhofer,[75] so too did the TLA.[76]

Summary judgment will not be granted "if, upon an examination of all the facts, it seems desirable to inquire thoroughly into them in order to clarify the application of the law to the circumstances." *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962). Here, further development of the factual record concerning Fraunhofer's obligations under the parties' complex contractual scheme and Fraunhofer's allegedly improper conduct is needed to clarify the application of the law of misappropriation to the circumstances of the case. "[F]urther development

---

[72] TLA at 1 (Recitals).

[73] *Id.* §§ 2.1, 1.4, 1.5.

[74] *Id.* § 8.1.

[75] TTA § 9.3.

[76] TLA § 11.2 ("The Parties are creating an independent contractor relationship under this Agreement.").

20

of the factual record and the parties' legal arguments would help clarify the application of the law to the circumstances of the case." *Bouchard v. Braidy Indus., Inc.*, 2020 WL 2036601, at \*16 (Del. Ch. Apr. 28, 2020) (denying summary judgment).[77]

---

[77] Further factual development will help to clarify the application of the statutory regime to the circumstances of this case under the four-part test reiterated in *Elenza* and the statutory definition of "misappropriation" under DUTSA. *Compare Elenza*, 183 A.3d at 721 (applying four-part test), *with Beard Res.*, 8 A.3d at 589–90 (not mentioning the four-part test minted in the case law and instead explaining: "To maintain a successful claim for misappropriation of trade secrets [under DUTSA], a plaintiff must show both the existence of a trade secret and its misappropriation."). Fraunhofer's status under the contractual scheme as an "independent contractor," rather than an employee, may or may not be determinative. *Compare Restatement (Third) of Unfair Competition* § 42 (Am. Law Inst. 1995) ("An employee or former employee who uses or discloses a trade secret owned by the employer or former employer in breach of a duty of confidence is subject to liability for appropriation of the trade secret . . . ."), *with id.* § 42 cmt. a ("The issues discussed in this Section are primarily applicable to persons who are regarded under the law of agency as employees or 'servants' of the trade secret owner as distinguished from 'independent contractors.'"); *see id.* § 42 cmt. a ("In some circumstances . . . , the rules relating to employees as stated in this Section may be useful by analogy in cases involving independent contractors."); *cf.* Louis Altman & Malla Pollack, 3 *Callman on Unfair Competition, Trademarks and Monopolies* § 14:18 (4th ed. 2005) ("One who is employed to invent is regarded as having hired out to his employer the whole of his inventive powers. Under such conditions the employer becomes the owner of any inventions; and will be free to use, patent, or scrap them."); *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at \*22 (Del. Ch. Feb. 18, 2010) (finding that former employees had misappropriated former employer's trade secrets even though they invented the trade secrets because "[a]n employee can be forbidden from appropriating a technical trade secret even though [the] secret was the employee's own idea"). In light of these issues, and in light of the fact that "[t]here is no 'right' to a summary judgment," the Court declines to enter judgment in Fraunhofer's favor with respect to iBio's claim for misappropriation of trade secrets at this stage. *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002).

21

**B.** **Fraunhofer Is Entitled to Summary Judgment on Count Three in Part and Counts Five, Nine, Ten, and Eleven in Their Entirety.**

Fraunhofer seeks summary judgment as to Counts Five (Fraud) and Eleven (Unjust Enrichment) on the grounds that they are essentially disguised contract claims that fail as a matter of law. Fraunhofer argues it is entitled to summary judgment as to Counts Three (Injunctive Relief), Nine (Constructive Trust), and Ten (Partial Rescission) because they are merely remedies cloaked as free-standing claims.

**1.** **Count Five (Fraud) Improperly Bootstraps iBio's Breach of Contract Claim.**

Count Five is a claim for common law fraud. iBio alleges that Fraunhofer committed fraud because "Yusibov, and Fraunhofer, made false representations . . . that Dr. Yusibov and Fraunhofer respected iBio's comprehensive ownership rights to the plant-based technology Fraunhofer was developing (and acquiring) and that Fraunhofer was not making unauthorized use of iBio's technology."[78] Fraunhofer asserts that Count Five is an improper attempt by iBio to bootstrap its breach of contract claims.

A plaintiff "cannot 'bootstrap' a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations." *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *15

---

[78] Sec. Am. Compl. ¶ 179.

(Del. Ch. Dec. 22, 2010) (internal citations and quotation marks omitted); *see also MicroStrategy Inc. v. Acacia Res. Corp.*, 2010 WL 5550455, at *17 (Del. Ch. Dec. 30, 2010) ("[A] plaintiff cannot state a claim for fraud simply by adding the term 'fraudulently induced' to a complaint or alleging that the defendant never intended to comply with the agreement at issue at the time the parties entered into it."). "Couching an alleged failure to comply with the [parties' contracts] as a failure to disclose an intention to take certain actions arguably inconsistent with that agreement is exactly the type of bootstrapping this Court will not entertain." *BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.*, 2004 WL 1739522, at *8 (Del. Ch. Aug. 3, 2004). In other words, "[a] bootstrapped fraud claim thus takes the simple fact of nonperformance, adds a dollop of the counterparty's subjective intent not to perform, and claims fraud." *Smash Franchise P'rs, LLC v. Kanda Hldgs., Inc.*, 2020 WL 4692287, at *16 (Del. Ch. Aug. 13, 2020).

As evidence of the alleged fraud, iBio relies on a single sentence in a three-and-a-quarter-page, single-spaced memorandum that Fraunhofer delivered to iBio on November 6, 2014 (the "November 6 Memorandum"). The sentence states: "It was never Fraunhofer's intention to, and Fraunhofer never did, convey to iBio, or to any other entity, all of its trade secrets, other technological know-how, and/or unspecified inventions in the field of plant biology or the use of plants in the

23

production of various proteins or therapeutics."[79] iBio seizes on this statement[80] as a "smoking gun" of sorts, claiming that it demonstrates that "it was never Fraunhofer's intention to follow through on the commitments it made to iBio when it agreed to the TTA, TLA, and other contracts."[81]

The November 6 Memorandum does not create a reasonable inference that Fraunhofer never intended to perform its contracts with iBio. The November 6 Memorandum was sent by Fraunhofer to iBio in preparation for an upcoming meeting between the parties to discuss their disagreement over their contracts. Fraunhofer emailed the November 6 Memorandum to iBio along with a proposed agenda for the meeting.[82] The first item on the proposed agenda was: "Clarify IP ownership."[83] Consistent with that agenda item, the cover email explained that the November 6 Memorandum "stat[ed] the position of Fraunhofer USA regarding the extent of the [Center]-developed IP rights that have been transferred to iBio."[84] It further explained:

---

[79] Selden Aff. Ex. 34, at FCMB001557.

[80] iBio also relies on the testimony of Fraunhofer's corporate secretary who confirmed he sent the November 6 Memorandum and believed the statement was true at the time it was sent. Selden Aff. Ex. 8, at 237–38 (Eby).

[81] Pl.'s Answering Br. 25.

[82] Selden Aff. Ex. 34, at FCMB001555.

[83] *Id.* at FCMB001556.

[84] *Id.* at FCMB001555.

24

We on the Fraunhofer side believe that both sides have thoroughly explained their respective positions on IP ownership and the extent of [the Center's] exclusive development commitment, so there should be no need to review those positions in detail at the beginning of the meeting. You mentioned in a recent phone [conference] that iBio would provide to us a detailed analysis of its interpretation of the scope of its rights in the [Center]-developed Technology. Please send that analysis to us at your first opportunity. If you can do so before the weekend, that will help us prepare for the meeting. . . . Recognizing that Fraunhofer and iBio are not likely to agree on the scope of iBio's rights . . . , I strongly suggest that we open the meeting by starting with the patent rights that [the Center] has transferred to iBio . . . .[85]

The record demonstrates that Fraunhofer expected to discuss its position concerning the scope of iBio's contractual rights and Fraunhofer's contractual obligations at the parties' upcoming meeting. The November 6 Memorandum was merely a statement of that position[86]—not a statement that Fraunhofer never intended to perform under the parties' agreements. For example, the November 6 Memorandum stated:

At the outset, we can assure you that Fraunhofer has not and will not provide third party access to iBio's intellectual property or confidential information. Nothing Fraunhofer has ever intended to do with PlantForm, or any other entity, would violate the Agreements iBio has with Fraunhofer, nor will Fraunhofer use any intellectual property rights conveyed by Fraunhofer to iBio under those Agreements.

* * *

---

[85] *Id.*

[86] *Id.* at FCMB001557 ("This Memorandum states Fraunhofer's interpretation of the intent and effect of the various agreements among iBio and Fraunhofer . . . .").

25

[N]owhere within any of these Agreements did Fraunhofer agree to convey any trade secrets to iBio. Nowhere within any Agreement are any trade secrets identified, much less recited with specificity, as is the Technology defined in Appendix A.

\* \* \*

[W]hile the Agreements also fail to define the terms "trade secrets" or "know-how," the commonly understood definitions of both of these terms generally *exclude* information that is part of the general knowledge or literature generally available for public use. Thus, one step to resolving this dispute may be for the Parties to identify any specific protectable, propriety, non-patent rights that iBio wants to own and protect (regardless of the Parties' disagreement over current ownership of them), at which point iBio and Fraunhofer can then have a more concrete discussion regarding the current and future ownership or licensing of such rights and how these rights will be protected.[87]

iBio's argument that "it was never Fraunhofer's intention to follow through on the commitments it made to iBio when it agreed to the TTA, TLA, and other contracts"[88] is not a reasonable inference to be drawn from the text of the November 6 Memorandum, its cover email, and its accompanying agenda when viewed in their entirety. Thus, the allegation that Fraunhofer never intended to follow through on its contractual obligations is a textbook attempt at bootstrapping. *Narrowstep*, 2010 WL 5422405, at \*15; *MicroStrategy*, 2010 WL 5550455, at \*17.

---

[87] *Id.*

[88] Pl.'s Answering Br. 25.

iBio argues that the fraud claim is not bootstrapping because the parties' contractual relationship is the instrument by which Fraunhofer perpetuated its fraudulent scheme.[89]  iBio's entire fraud claim, however, is premised on the allegation that Fraunhofer did not intend to transfer the technology required under the parties' agreements.  iBio has not identified a broader fraudulent scheme beyond noncompliance with the parties' contracts and has not identified evidence that would create a genuine issue of material fact.  For this reason, iBio's reliance on *Narrowstep* is misplaced.  In *Narrowstep*, the parties entered into a merger agreement based on the defendant's fraudulent misrepresentations that it wanted to close the merger expeditiously.  Through these false representations, the defendant negotiated a merger agreement that allowed it to immediately gain operational control of the plaintiff.  The defendant siphoned the plaintiff's value, repeatedly renegotiated the purchase price with false reassurances that it intended to close, and ultimately abandoned the merger once it had effectively misappropriated the plaintiff's assets. *Narrowstep*, 2010 WL 5422405, at \*12–13.  No circumstance of this sort has been proffered at this stage of the litigation.

---

[89] *Id.* at 26.

### 2. Count Eleven (Unjust Enrichment) Is Duplicative of the Breach of Contract Claim.

Count Eleven is a claim for unjust enrichment. iBio asserts that "Fraunhofer has been enriched by its misconduct through funding from iBio and other parties intended to enhance and improve iBio's technology, and through the benefits received from Fraunhofer's unauthorized uses of and misrepresentations about ownership of iBio's technology."[90] Fraunhofer argues that iBio's unjust enrichment claim fails because the parties' relationship is governed by contract.

Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). Courts developed unjust enrichment as a theory of recovery to remedy the absence of a formal contract. *ID Biomedical Corp. v. TM Techs., Inc.*, 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995); *see also Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *42 (Del. Ch. Apr. 14, 2017) ("As its name implies, unjust enrichment is a flexible doctrine that a court can deploy to avoid injustice.").

In evaluating an unjust enrichment claim, the Court must first determine whether a contract governs the parties' relationship. If a contract comprehensively

---

[90] Sec. Am. Compl. ¶ 214.

governs the relevant relationship between the parties, then the contract must provide the measure of the plaintiff's rights, and any claim of unjust enrichment will fail. *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *27 (Del. Ch. Nov. 26, 2014). "[T]his Court routinely dismisses unjust enrichment claims that are premised on an 'express, enforceable contract that controls the parties' relationship' because damages is an available remedy at law for breach of contract." *Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *19 (Del. Ch. Sept. 18, 2014) (quoting *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009)).

iBio's unjust enrichment claim repeats the allegations in iBio's breach of contract claims. For example, Count Four alleges that Fraunhofer materially breached myriad provisions of the TTA, TLA, and Fourth Amendment through its "unauthorized use of the technology," "unauthorized disclosure of information concerning the technology," and "refusal to transfer the technology to iBio."[91] This is precisely the alleged misconduct that forms the basis for iBio's unjust enrichment claim: "Fraunhofer's unauthorized uses of and misrepresentations about ownership of iBio's technology."[92] iBio has not "identified any factual basis for [its] unjust enrichment claim independent of the allegations relating to [its] breach of contract

---

[91] *Id.* ¶ 175.

[92] *Id.* ¶ 214.

claim," and "the Agreement[s] provide[] the measure of [iBio's] rights here." *Doberstein v. G-P Indus., Inc.*, 2015 WL 6606484, at *6 (Del. Ch. Oct. 30, 2015).

Fraunhofer's motion for summary judgment on Count Eleven is granted.[93]

### 3. A Portion of Count Three (Injunctive Relief), Count Nine in its Entirety (Constructive Trust), and Count Ten in its Entirety (Partial Rescission) Are Remedies Styled as Independent Causes of Action.

Count Three requests "a declaratory judgment that Fraunhofer has no right to use of Bio's technology" except in limited circumstances and "an injunction preventing Fraunhofer from engaging in further . . . unauthorized use of iBio's technology and in further acts that are inconsistent with iBio's exclusive ownership rights."[94] Count Nine requests "a constructive trust over the technology that Fraunhofer has developed after 2014 based on its use of iBio's technology."[95] Count Ten requests "partial rescission of the agreements between iBio and Fraunhofer to the extent Fraunhofer was given rights to use iBio's technology and to the extent iBio would owe royalties for its use of iBio's technology."[96] Fraunhofer seeks

---

[93] iBio's brief nowhere responds to Fraunhofer's arguments concerning iBio's unjust enrichment claim and it has, therefore, conceded the issue. *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[94] *Id.* ¶¶ 168, 171.

[95] *Id.* ¶ 209.

[96] *Id.* ¶ 212.

summary judgment on the grounds that Counts Three, Nine, and Ten plead remedies rather than independent causes of action.

"This Court has recognized that a party may, on rare occasions, mistakenly plead a remedy as an enumerated cause of action." *VTB Bank v. Navitron Projects Corp.*, 2014 WL 1691250, at *6 (Del. Ch. Apr. 28, 2014). In the same vein, this Court has noted that "claims" for injunctions, constructive trusts, and rescission are remedies, rather than causes of action. *Quadrant Structured Prod. Co. v. Vertin*, 102 A.3d 155, 203 (Del. Ch. 2014) ("Injunctions are a form of relief, not a cause of action."); *VGS, Inc. v. Castiel*, 2003 WL 723285, at *6 (Del. Ch. Feb. 28, 2003) (noting that a claim for "constructive trust" is a remedy, not a cause of action); *ENI Hldgs., LLC v. KBR Gp. Hldgs., LLC*, 2013 WL 6186326, at *24 (Del. Ch. Nov. 27, 2013) ("Rescission is not a cause of action but a remedy available only where facts indicate equity so requires."). Dismissing counts that seek remedies instead of asserting claims is useful in "clean[ing] up the pleadings." *Quadrant*, 102 A.3d at 203; *e.g.*, *id.* (dismissing causes of action for injunctive relief in the form of permanent injunctions because "they seek remedies rather than assert claims"); *VGS*, 2003 WL 723285, at *6 (granting summary judgment to eliminate claims for injunction and constructive trust because they are remedies, not independent causes of action).

iBio has provided no basis for the remedies requested in Counts Nine and Ten to proceed to trial as separate causes of action.[97] If iBio prevails on its breach of contract claims, then it may very well be entitled to the remedies embodied in those Counts. Accordingly, Fraunhofer's motion for summary judgment as to Count Nine and Count Ten is granted without prejudice to iBio's ability to seek those remedies "[i]n the remedial stage of this action." *Quadrant*, 102 A.3d at 203.

Count Three, however, is not merely a request for injunctive relief—it seeks a declaratory judgment in addition to a permanent injunction.[98] Fraunhofer does not request summary judgment on the declaratory judgment portion of Count Three; it only requests summary judgment on the injunctive relief portion of Count Three. For the reasons stated above, summary judgment on the injunctive relief portion of Count Three is granted, but is denied as to the portion seeking a declaratory judgment.

### C.  Fraunhofer Is Entitled to Summary Judgment on Count Six.

As discussed earlier in this opinion, iBio alleges Fraunhofer misappropriated iBio's trade secrets in violation of DUTSA. Fraunhofer argues that several of iBio's other state law claims—Counts Five, Six, Seven, Eleven, and Twelve—are

---

[97] *See* Pl.'s Answering Br. 30 (dedicating one paragraph to the issue of whether iBio's "remedies" claims should proceed separately and merely arguing that the Court "retains broad remedial powers irrespective of the label on any claim").

[98] Sec. Am. Compl. ¶¶ 168, 171.

misappropriation claims that are "preempted" under DUTSA. Because the Court has granted summary judgment on other grounds as to Counts Five (Fraud) and Eleven (Unjust Enrichment),[99] this Section addresses Fraunhofer's preemption argument only as to Counts Six (Conversion), Seven (Tortious Interference), and Twelve (Violation of UDTPA).

### 1. Displacement of Common Law Claims Under DUTSA

Section 2007 of DUTSA provides:

> (a)     Except as provided in subsection (b) of this section, this chapter displaces conflicting tort, restitutionary and other law of this State providing civil remedies for misappropriation of a trade secret.
>
> (b)     This chapter does not affect:
>
> > (1)     Contractual remedies, whether or not based upon misappropriation of a trade secret;
> > (2)     Other civil remedies that are not based on misappropriation of a trade secret; or
> > (3)     Criminal remedies, whether or not based upon misappropriation of a trade secret.

The parties disagree over a threshold question under the statute: Does the statute displace claims that seek to protect confidential information that does not qualify as a trade secret under DUTSA? iBio argues the statute does not prevent iBio from pursuing such claims, particularly when Fraunhofer insists that iBio has

---

[99] *See supra* Sections II.B.1–2.

not stated a valid trade secrets claim.[100] iBio adopts what has been referred to as the "Trade Secrets Only" view of the uniform act, whereby Section 2007 "does not apply in a case where the information in question does not qualify as a UTSA Trade Secret." John T. Cross, *UTSA Displacement of Other State Law Claims*, 33 Hamline L. Rev. 445, 451 (2010). Under this view, if the information is not a trade secret under the statute, then the party is free to try to recover under any other state law theory that might provide relief. *Id*. at 452.

Fraunhofer contends, however that DUTSA displaces state law claims which seek to protect confidential information, regardless of whether it qualifies as a trade secret. Fraunhofer relies on the Delaware Supreme Court's decision in *Savor*, which upheld the dismissal of common law claims "based on the same alleged wrongful conduct as the trade secrets claims." *Savor*, 812 A.2d at 898. Under this view, common law claims are precluded even if "the trial court has not yet determined that a trade secret exists." *Id.*

Beyond *Savor*, recent decisions from this Court and the Superior Court that have carefully analyzed this issue have concluded that Delaware "has joined the 'majority view' that Section 2007 of DUTSA precludes common law claims based on misappropriation of business information even in cases in which the claim does

---

[100] Pl.'s Answering Br. 27–28.

not meet the statutory definition of 'trade secret' under the Code." *Atl. Med. Specialists, LLC v. Gastroenterology Assocs., P.A.*, 2017 WL 1842899, at \*15 (Del. Super. Apr. 20, 2017). Thus, "[p]reemption applies regardless of whether the information would ultimately rise to the level of a trade secret." *Alarm.com Hldgs., Inc. v. ABS Capital P'rs Inc.*, 2018 WL 3006118, at \*11 (Del. Ch. June 15, 2018) (internal quotation marks and citation omitted), *aff'd on other grounds*, 204 A.3d 113 (Del. 2019) (TABLE); *see also Smash*, 2020 WL 4692287, at \*15 (denying preliminary injunction on trade secrets act claim and concluding claim for conversion of confidential information was displaced under DUTSA); *GWO Litig. Tr. v. Sprint Sols., Inc.*, 2018 WL 5309477, at \*12 (Del. Super. Oct. 25, 2018) (concluding that conversion and unfair competition claims were displaced under DUTSA).[101]

iBio relies on this Court's decision in *Beard Research Inc. v. Kates*, 8 A.3d 573, 602 (Del. Ch. 2010), for the proposition that summary judgment should be denied "[b]ecause none of the claims targeted by Fraunhofer depend on whether [iBio's] trade secret claim is ultimately successful."[102] In *Beard*, the Court held that

---

[101] iBio's reliance on *Moon Express, Inc. v. Intuitive Machines, LLC*, 2017 WL 4217335, at \*11 (D. Del. Sept. 22, 2017), does not control. Pl.'s Answering Br. 28. *Moon Express* did not hold that otherwise displaced claims survive if the viability of the trade secrets claim is in doubt.

[102] Pl.'s Answering Br. 28.

a fiduciary duty claim was not displaced by DUTSA in part because a fiduciary duty claim "can be premised on the misuse of a plaintiff's confidential information, even if that information does not rise to the level of a trade secret." 8 A.3d at 602. As Vice Chancellor Laster recently explained in *Alarm.com*, the "distinguishing fact" in the *Beard* decision was that it involved "a fiduciary relationship, which required proof beyond what is required for misappropriation under DUTSA and which brings with it special duties and obligations." 2018 WL 3006118, at *10. No such fiduciary relationship exists here.[103]

I am mindful that the Delaware Supreme Court recently expressed no opinion as to the question of DUTSA preemption in affirming the decision in *Alarm.com*. 204 A.3d 113 n.1 ("[W]e do not need to, and therefore do not, reach the preemption question."). Nevertheless, based upon *Savor* and the carefully reasoned opinions of Judge Butler in *Atlantic Specialists* and Vice Chancellor Laster in *Alarm.com*, I agree that DUTSA may preempt common law claims based upon misappropriation of confidential information that does not otherwise qualify as a trade secret under

---

[103] In *Alarm.com*, the Court also declined to apply *Overdrive Inc. v. Baker & Taylor, Inc.*, 2011 WL 2448209, at *9 (Del. Ch. June 7, 2011), another case the parties mention in briefing. In *Overdrive*, the Court found that it was "premature" to consider at the pleading stage whether a conversion claim was displaced under DUTSA because "the question of whether a trade secret was involved cannot be answered with certainty." *Id.* at *5. In *Alarm.com*, the Court explained that the *Overdrive* decision "gave relatively brief treatment to the [displacement] issue," "did not explore the intent of the drafters of [DUTSA] or the rationale for the preemption provision" in DUTSA, and "did not discuss the Delaware Supreme Court's decision in *Savor*." 2018 WL 3006118, at *10.

the statute. Adherence to the majority view of courts applying the uniform act respects the statutory admonition that DUTSA "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it." 6 *Del. C.* § 2008; *see* Warrington S. Parker, III & Daniel D. Justice, *The Differing Approaches to Preemption Under the Uniform Trade Secrets Act*, 49 Tort Trial & Ins. Prac. L.J. 645, 647 (2014) (explaining that the majority view is that the uniform act "preempts all common law tort claims based on the misappropriation of information, whether or not it meets the statutory definition of a trade secret"); Richard F. Dole, Jr., *Preemption of Other State Law by the Uniform Trade Secrets Act*, 17 SMU Sci. & Tech. L. Rev. 95, 109 (2014) ("The majority approach preempts noncontractual legal claims protecting business information, whether or not the business information is a . . . trade secret.").

As to the threshold question, iBio's claims in Counts Six, Seven, and Twelve may be subject to displacement even if iBio has not established a claim for misappropriation of a trade secrets under DUTSA. Resolving the threshold question, however, does not end the analysis. The Court must now consider whether iBio's specific claims for conversion, tortious interference with prospective economic advantage, and violation of UDPTA are preempted under DUTSA. Those claims are displaced and cannot be maintained if they are "based on the same alleged wrongful conduct as the trade secrets claim[]." *Savor*, 812 A.2d at 898.

37

## 2. Count Six (Conversion) Is Displaced by DUTSA.

Count Six alleges that Fraunhofer converted iBio's technology when Fraunhofer "wrongfully exercised dominion over iBio's proprietary technology, in denial of, and inconsistent with, iBio's rights, including through improper disclosure, use, advertising and misrepresentations of ownership."[104] Conversion is "any distinct act of dominion wrongfully exerted over the property of another, in denial of the plaintiff's right, or inconsistent with it. *Kuroda*, 971 A.2d at 889. A common law claim for conversion is subject to displacement under DUTSA. *See, e.g.*, *Smash*, 2020 WL 4692287, at *15; *GWO*, 2018 WL 5309477, a *12.

iBio's conversion claim rests on the same facts as its misappropriation claim. iBio asserts that Fraunhofer "wrongfully exercised dominion over iBio's proprietary technology."[105] That assertion is a further iteration of iBio's misappropriation claim, which alleges that Fraunhofer "improperly used and disclosed or . . . intends improperly to use and disclose" iBio's trade secrets.[106] iBio states that Fraunhofer committed conversion "through improper disclosure, use, advertising and misrepresentations of ownership."[107] The basis of that allegation is the same as for

---

[104] Sec. Am. Compl. ¶ 189.

[105] *Id.*

[106] *Id.* ¶ 202.

[107] *Id.* ¶ 189.

iBio's misappropriation claim: that Fraunhofer misappropriated iBio's trade secrets "[b]y using or proposing to use iBio's technology[] without iBio's authorization."[108]

iBio argues that its conversion claim is not displaced because the "property converted included more than the trade secrets at issue."[109]  Specifically, iBio contends the Court's 2016 Opinion held that iBio's ownership rights include "proprietary know-how" which does not qualify as a trade secret and that Fraunhofer converted that proprietary know-how.[110]  This argument is flawed for two reasons. First, it conflicts with iBio's position in briefing that its trade secrets are "the optimized process for operating its plant-based manufacturing system as a whole, the optimized process of applying it to specific proteins, and the *proprietary methods and know-how* for optimizing each step of the process."[111]  Second, as discussed above, DUTSA may preempt common law claims based upon misappropriation of confidential information that does not qualify as a trade secret under the statute.[112] Even if the "proprietary know-how" that seems to form the basis for iBio's conversion claim does not qualify as a trade secret, it is subject to displacement under DUTSA.

---

[108] *Id.* ¶ 202.

[109] Pl.'s Answering Br. 29.

[110] *Id.*

[111] *Id.* (emphasis added).

[112] *See supra* Section II.C.1.

### 3. Count Seven (Tortious Interference with Prospective Economic Advantage) Is Not Displaced by DUTSA at this Stage.

Count Seven alleges that Fraunhofer "intentionally interfered" with iBio's opportunity to contract with the Biomedical Advanced Research and Development Authority ("BARDA")—a part of the U.S. Department of Health and Human Services—"by, at least, competing for that opportunity with iBio using iBio's own technology and by wrongfully representing to BARDA that iBio's technology was in fact owned by Fraunhofer."[113]

Neither party's briefs meaningfully addressed the effect of Section 2007 of DUTSA on claims for tortious interference with prospective economic advantage.[114] Therefore, in light of at least some authority standing for the proposition that the Uniform Trade Secrets Act generally "does not displace . . . [claims for] tortious interference with prospective business advantage," the Court declines to enter summary judgment in Fraunhofer's favor on this claim. Cross, *supra*, at 465 & n.79 (collecting cases). Further development of the factual record, including as to how

---

[113] Sec. Am. Compl. ¶ 194.

[114] *See* Def.'s Opening Br. 31–32 (dedicating but one paragraph to iBio's tortious interference claim); Pl.'s Answering Br. 27–31 (nowhere addressing the argument that iBio's tortious interference claim is displaced by DUTSA); Def.'s Reply Br. 8 (assuming in one sentence that summary judgment on iBio's tortious interference claim is appropriate).

exactly "Fraunhofer procured a contract with BARDA"[115] and whether it used iBio's trade secrets or confidential information in so doing, is also needed.

### 4. Count Twelve (Deceptive Trade Practices) Is Not Displaced by DUTSA at this Stage.

Count Twelve alleges that Fraunhofer violated Section 2532 of UDTPA, 6 *Del C.* § 2532, "at least by: misrepresenting that its (unauthorized) use of iBio's technology did not require iBio's approval; disparaging iBio by making false or misleading representations to others . . . that Fraunhofer owned iBio's technology; and engaging in conduct which creates a likelihood of confusion or misunderstanding as to the ownership of iBio's technology."[116]

As with Count Seven, neither party meaningfully briefed the effect of Section 2007 of DUTSA on statutory claims for deceptive trade practices under UDTPA.[117] This Court's decision in *Overdrive* seems to be the only Delaware case to have briefly addressed this issue,[118] but neither Fraunhofer nor iBio has sufficiently addressed the policy implications of reading Section 2007 of DUTSA as displacing

---

[115] Sec. Am. Compl. ¶ 125.

[116] *Id.* ¶ 221.

[117] *See* Def.'s Opening Br. 32–33 (dedicating but one paragraph to displacement of UDTPA claims under DUTSA); Pl.'s Answering Br. 30 (same); Def.'s Reply Br. at 9 (same).

[118] 2011 WL 2448209, at *9.

41

related statutory claims under UDTPA. Therefore, the Court declines to enter summary judgment in Fraunhofer's favor on Count Twelve.[119]

In sum, Fraunhofer is entitled to a summary judgment that Count Six is displaced by DUTSA, but is not entitled to summary judgment on Counts Seven and Twelve.

## D. Fraunhofer Has Not Established that iBio's Contract and Misappropriation Claims Are Time-Barred.

Fraunhofer argues that iBio's breach of contract and misappropriation claims are time barred by the doctrine of laches. "Laches is an affirmative defense that the plaintiff unreasonably delayed in bringing suit after learning of an infringement of his or her rights. . . . In determining whether an action is barred by laches, the Court of Chancery will normally . . . apply the period of limitations by analogy . . . ." *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 769 (Del. 2013) (internal citations omitted). "[L]aches generally requires the establishment of three things: first,

---

[119] Fraunhofer separately argues that iBio lacks standing to bring a claim under UDTPA because Fraunhofer is incorporated in Rhode Island and thereby subject to Rhode Island law and because iBio and Fraunhofer are not direct competitors. Def.'s Opening Br. 32–33; Def.'s Reply Br. 8. Given that Fraunhofer's alleged misconduct seems to have taken place largely in Delaware where the Center is located, the Court cannot determine at this stage that UDPTA does not apply to Fraunhofer. "[A] litigant has standing under [UDPTA] . . . when such person has a business or trade interest at stake which is the subject of interference by the unfair or deceptive trade practices of another." *Grand Ventures, Inc. v. Whaley*, 632 A.2d 63, 70 (Del. 1993). Because iBio alleges and provides evidence of such interest, the Court cannot conclude at this stage that iBio lacks standing under UDPTA.

knowledge by the claimant; second, unreasonable delay in bringing the claim, and third, resulting prejudice to the defendant." *Reid v. Spazio*, 970 A.2d 176, 182–83 (Del. 2009). Laches requires a factually intensive inquiry into the reasonableness of delay. "Whether or not [the elements of laches] exist is generally determined by a fact-based inquiry, and therefore summary judgment is rarely granted on a laches defense." *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3d 62, 79 (Del. Ch. 2013) (quoting *Tafeen v. Homestore, Inc.*, 2004 WL 556733, at *8 (Del. Ch. Mar. 16, 2004)); *see also Clark v. Packem Assocs.*, 1991 WL 36470, at *5 (Del. Ch. Mar. 6, 1991) ("The determination of the validity of the laches defense is one of fact, and is rarely granted on summary judgment.").

The parties agree that the analogous statute of limitations governing each of iBio's claims is three years.[120] iBio filed its original complaint on March 16, 2015. Therefore, claims that accrued prior to March 16, 2012 are presumptively barred by laches. The Complaint alleges that iBio learned of Fraunhofer's work with PlantForm in the summer of 2014—well within the analogous limitations period. Fraunhofer argues, however, that iBio's claims are time barred because iBio was "aware of its potential claims" as early as 2009 and 2010, when "iBio had complained that Fraunhofer had failed to: acknowledge that iBio owned the

---

[120] Def.'s Opening Br. 36–37; Pl.'s Answering Br. 32.

technology, provide sufficient information regarding the technology to iBio, and meet its contractual obligations to transfer the technology to iBio."[121] Fraunhofer provides several examples of this alleged awareness: In early 2009, iBio complained that its ownership of the technology was not sufficiently credited by Fraunhofer and the third-party funding sources in their press releases.[122] In October 2009, iBio complained that Fraunhofer's cooperation with iBio's technology transfer specialist was "inadequate or unacceptable."[123] In 2011, an iBio representative blamed Fraunhofer's failure to transfer technology to iBio as the cause of an investor's decision to delay his investment indefinitely.[124]

Under Delaware law, a plaintiff's cause of action accrues "at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action." *ISN Software Corp. v. Richards, Layton & Finger, P.A.*, 226 A.3d 727, 732 (Del. 2020). For a breach of contract claim, "the wrongful act occurs at the time a contract is breached." *Id.* "[C]laims for misappropriation of trade secrets accrue at the time the misappropriation is discovered or, by the exercise of reasonable diligence, should have been discovered." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 2005 WL 1089027, at *13 (Del. Ch. May 4, 2005).

---

[121] Def.'s Opening Br. 37.

[122] *See, e.g.*, Schiltz Aff. Ex. 64 (dated March 6, 2009); Ex. 62 (dated January 26, 2009).

[123] Schiltz Aff. Ex. 19.

[124] *See* Schiltz Aff. Ex. 106.

Although the parties had contractual disputes as early as 2009, they also continued negotiating their contractual relationship, and Fraunhofer continued transferring technology well after these initial disputes began. Thus, there remains a genuine issue of material fact whether these discreet incidents about the marketing or branding of the technology constituted the requisite wrongful acts so as to trigger the statute of limitations. Summary judgment barring iBio's breach of contract claim must be denied on this basis alone.

For similar reasons, iBio's misappropriation claim is not barred because there remains a genuine issue of material fact as to whether iBio discovered or should have discovered the misappropriation of its trade secrets through these discreet disagreements alone. Fraunhofer has not established that iBio had discovered or should have discovered that Fraunhofer was using the technology on behalf of iBio's competitors—particularly when Fraunhofer's relationship with PlantForm did not even begin until 2013. Therefore, summary judgment on the issue of laches is denied. *See, e.g.*, *Whittington v. Dragon L.L.C.*, 2008 WL 4419075, at *7–8 (June 6, 2008) (denying summary judgment on laches due to genuine issues of material fact).[125]

---

[125] Because there are issues of material fact precluding summary judgment on laches, the Court need not address Fraunhofer's assertion that, due to iBio's alleged delay in bringing this action, Fraunhofer suffered "detrimental changes in position" and "significant prejudice." Def.'s Opening Br. 43.

## E. Fraunhofer Has Not Established as a Matter of Law that iBio's Claims Are Barred by iBio's "Failure to Pay" or by the Terms of Settlement.

Fraunhofer argues that iBio's breach of contract and misappropriation of trade secrets claims are barred by iBio's failure to fulfill its contractual payment obligations and by the Terms of Settlement.[126] Fraunhofer essentially argues that its performance is excused due to iBio's non-performance, repudiation, and release.

First, Fraunhofer asserts that iBio "never made" or "unilaterally decided not to honor" two payment obligations set forth in the Fourth Amendment, thus excusing Fraunhofer's own contractual obligations.[127] "Substantial failure to live up to the material terms of a valid contract nullifies that contract. A party may terminate or rescind a contract because of substantial nonperformance or breach by the other party." *DeMarie v. Neff*, 2005 WL 89403, at *4 (Del. Ch. Jan. 12, 2005). Yet, "although a material breach excuses performance of a contract, a nonmaterial—or *de minimis*—breach will not allow the non-breaching party to avoid its obligations under the contract." *Id.*; *see also Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.*, 2013 WL 3934992, at *11 (Del. Ch. July 24, 2013) ("A party is excused from performance under a contract when the other party materially breaches that contract.").

---

[126] *Id.* at 44–53.

[127] *Id.* at 45.

46

iBio urges the Court to reject Fraunhofer's argument on summary judgment because it is contrary to the Court's determination in the 2016 Opinion. In that opinion, then-Vice Chancellor, now Justice, Montgomery-Reeves addressed the scope of the release contained in the Terms of Settlement. In rejecting Fraunhofer's argument that the Terms of Settlement included a general release, the Court "conclude[d] . . . that rather than a general release, Section 6's generically-worded 'other accrued claims' must be read as limited to payment obligations between the parties, given that the specific terms were all directed to payment obligations." *Id.* at *16 (internal quotations omitted). Thus, iBio contends, Fraunhofer's argument fails because any claims based upon non-payment were released.

Faced with the 2016 Opinion, Fraunhofer pivots to its second argument, asserting that "the Terms of Settlement restructured the parties' relationship" and provided Fraunhofer with "a release of claims related to the disputes regarding information sharing and technology transfer."[128] iBio responds that "[t]he Terms of Settlement, read as a whole, modified or released financial obligations between iBio and Fraunhofer—it did not give away any of iBio's rights to the technology, including the technology transfer right."[129] Indeed, the Court specifically considered, and rejected, Fraunhofer's argument that in the Terms of Settlement,

---

[128] Def.'s Opening Br. 53.

[129] Pl.'s Answering Br. 41.

"'iBio released any claims arising out of the parties' agreements,' both known and unknown, including 'claims relating to iBio's purported ownership of intellectual property that existed as of June 30, 2013' and 'any claims after that date.'" *iBio*, 2016 WL 4059257, at *15 (quoting Fraunhofer's answering brief).

Fraunhofer seeks to avoid the 2016 Opinion by asserting in a footnote that Fraunhofer "did not ask the Court then to address the separate question of whether [Section] 1 of the Terms of Settlement represented a restructuring of the parties' relationship and a shift to payments tied to project-specific work and tasks, or whether Paragraph 6 released claims for failure to provide services before that restructuring."[130]

Fraunhofer's argument, however, does not consider the overall context of the 2016 Opinion. Then-Vice Chancellor, now Justice, Montgomery-Reeves determined to answer a threshold question at the heart of this dispute: "What is the scope of the technology in Fraunhofer's possession—*under all of the relevant agreements between the parties*—to which iBio has ownership rights and *to which iBio is entitled to receive a transfer from Fraunhofer*?" *iBio*, 2016 WL 4059257, at *1 (emphasis added). In briefing that issue, the parties argued, and the Court considered, "all of the relevant agreements between the parties," including the Terms

---

[130] Def.'s Opening Br. 52 n.27.

of Settlement. The Court determined the effect of the release language in the Terms of Settlement on iBio's "ownership rights" of the technology "to which iBio is entitled to receive a transfer from Fraunhofer." With that perspective, Fraunhofer's position on summary judgment, as iBio contends, is merely an attempt to reargue the threshold question that the parties placed before the Court and the Court decided in the 2016 Opinion.[131]

Even accepting Fraunhofer's new contract argument, summary judgment is unavailing. Fraunhofer does not parse the contractual language in Section 1 or otherwise explain how it reaches the conclusion that "the document restructured the relationship and resolved the key disputes relative to, *inter alia*, information exchange and technology transfer."[132] Instead, Fraunhofer cites extrinsic evidence purportedly supporting its interpretation.[133] The analysis, however, does not begin

---

[131] The Court declines Fraunhofer's invitation, in that same footnote, to revisit the 2016 Opinion as to the scope of the release. *Id.* Fraunhofer's argument seeks to avoid a decision that is law of the case. *See Kenton v. Kenton,* 571 A.2d 778, 784 (Del. 1990) ("The 'law of the case' is established when a specific legal principle is applied to an issue presented by facts which remain constant throughout the subsequent course of the same litigation."). Although law of the case is not an inflexible doctrine, Fraunhofer has not established any exception to its application on this record that would warrant summary judgment. *See Gannett Co. v. Kanaga,* 750 A.2d 1174, 1182 (Del. 2000) (noting exceptions to law of the case doctrine "for clearly erroneous decisions, unjust results or significantly changed circumstances); *Weedon v. State*, 750 A.2d 521, 527–28 (Del. 2000) (noting exceptions to the law of the case doctrine when the "previous ruling was clearly in error or there was an important change in circumstances" or an "equitable concern of preventing injustice").

[132] Def.'s Opening Br. 50–51.

[133] *Id.* at 51–53.

outside the four corners of the agreement; it begins with the text of the agreement itself. *See O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 289 (Del. 2001) ("The duty of the courts is to examine solely the language of the contractual provisions in question to determine whether the disputed terms are capable of two or more reasonable interpretations.").

Following the 2016 Opinion, Fraunhofer's argument at most seeks to find ambiguity in the scope of the release in the Terms of Settlement. "Where contract provisions are ambiguous, summary judgment is inappropriate if 'the moving party has failed to offer uncontested evidence as to the proper interpretation.'" *AM Gen. Hldgs. LLC v. Renco Grp., Inc.*, 2019 WL 1567488, at *7 (Del. Ch. Apr. 10, 2019) (citing *GMG Capital Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 784 (Del. 2012)). Fraunhofer "has not provided evidence suggesting that its construction is the *only* reasonable interpretation." *Id.* (internal quotation marks omitted). Summary judgment is therefore inappropriate.

## III. CONCLUSION

For the foregoing reasons, pursuant to Court of Chancery Rule 56, Fraunhofer's motion for summary judgment is GRANTED in part and DENIED in part. Summary judgment on Counts Five, Six, Nine, Ten, and Eleven is granted. Summary judgment on Count Three is granted in part. Summary judgment on Counts One, Two, Four, Seven, Eight, and Twelve is denied.

50

**IT IS SO ORDERED**.